UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN MOLINA, JR.,<br><br>                    Petitioner,<br><br>        v.<br><br>M. GAMBOA,<br><br>                    Respondent. | Case No.   1:21-cv-00215-JLT-HBK (HC)<br><br>FINDINGS AND RECOMMENDATIONS TO DENY PETITIONER'S PETITION AND DECLINE TO ISSUE A CERTIFICATE OF APPEALABILITY [1]<br><br>FOURTEEN-DAY OBJECTION PERIOD |

## I.    STATUS

Petitioner Juan Molina, Jr. ("Petitioner" or "Molina"), a state prisoner, is proceeding pro se on his Petition for Writ of Habeas Corpus filed under 28 U. S.C. § 2254 on February 12, 2021. (Doc. No. 1, "Petition").  The Petition challenges Petitioner's judgment of conviction entered by the Kern County Superior Court (case no. BF159213A) for second degree murder (count 1) and destruction or concealment of evidence (count 2) for which Petitioner was sentenced to an indeterminate 15 year to life sentence (count 1) and a concurrent term of 180 days (count 2).  (*Id.* at 1).[2]  The Fifth Appellate District Court affirmed Molina's judgment on direct appeal (Case No.

---

[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302 (E.D. Cal. 2022).

[2] All citations to the pleadings and record are to the page number as it appears on the Case Management and Electronic Case Filing ("CM/ECF") system.

F074033).  (Doc. No. 18-18).  On August 24, 2022, the California Supreme Court summarily denied Molina's petition for review (Case No. S257907).  (Doc. No. 18-20).

The Petition advances the following (restated) grounds for relief:

> (1) The State failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963);
>
> (2) The prosecutor committed misconduct by introducing known perjured testimony in violation of Petitioner's right to a fair trial;
>
> (3) Trial and appellate counsel rendered constitutionally ineffective assistance when:
>
>> (a) Trial counsel failed to introduce the Sprint cell phone bill; failed to investigate the cell phone records; and failed to object to Ortiz' "second statement";
>>
>> (b) Appellate counsel failed to raise on appeal the Petitioner's cell phone claim and failed to file a state habeas petition on Petitioner's behalf;
>
> (4) There was insufficient evidence of malice aforethought to support Petitioner's second-degree murder conviction.

(*See generally* Doc. No. 1 at 18-19).  Respondent filed an Answer (Doc. No. 17) and lodged the state court record in support (Doc. No. 18, 18-1 through 18-26).  Petitioner filed a Reply to the Answer.  (Doc. No. 21).  This matter is deemed submitted on the record before the Court.  After careful review of the record and applicable law, the undersigned recommends the district court deny Petitioner relief on his Petition and decline to issue a certificate of appealability.

## II.     GOVERNING LEGAL PRINCIPLES

### A.     Evidentiary Hearing

In addition to requesting the Court to grant the Petition, Petitioner seeks an evidentiary hearing in his Petition.  (Doc. No. 1 at 16).  Petitioner does not elaborate on which claim(s) he requests an evidentiary hearing nor the reasons why an evidentiary hearing is necessary.  "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).  "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."  *Id*.  Here, the state

1  courts adjudicated each of Petitioner's claims on the merits.  This Court finds that the pertinent

2  facts of this case are fully developed in the record before the Court; thus, no evidentiary hearing

3  is required.  *Cullen v. Pinholster*, 563 U.S. 170 (2011).

4      **B. AEDPA General Principles**

5      A federal court's statutory authority to issue habeas corpus relief for persons in state

6  custody is set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death

7  Penalty Act of 1996 (AEDPA).  AEDPA requires a state prisoner seeking federal habeas relief to

8  first "exhaus[t] the remedies available in the courts of the State."  28 U.S.C. § 2254(b)(1)(A).  If

9  the state courts do not adjudicate the prisoner's federal claim "on the merits," a *de novo* standard

10  of review applies in the federal habeas proceeding; if the state courts do adjudicate the claim on

11  the merits, then the AEDPA mandates a deferential, rather than *de novo*, review.  *Kernan v.*

12  *Hinojosa*, 136 S. Ct. 1603, 1604 (2016).  This deferential standard, set forth in § 2254(d), permits

13  relief on a claim adjudicated on the merits, but only if the adjudication:

14
15          (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

16
17          (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

18  28 U.S.C. § 2254(d).  This standard is both mandatory and intentionally difficult to satisfy.

19  *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018); *White v. Woodall*, 572 U.S. 415, 419 (2014).

20      "Clearly established federal law" consists of the governing legal principles in the

21  decisions of the United States Supreme Court when the state court issued its decision.  *White*, 572

22  U.S. at 419.  Habeas relief is appropriate only if the state court decision was "contrary to, or an

23  unreasonable application of," that federal law.  28 U.S.C. § 2254(d)(1).  A decision is "contrary

24  to" clearly established federal law if the state court either: (1) applied a rule that contradicts the

25  governing law set forth by Supreme Court case law; or (2) reached a different result from the

26  Supreme Court when faced with materially indistinguishable facts.  *Mitchell v. Esparza*, 540 U.S.

27  12, 16 (2003).

28      A state court decision involves an "unreasonable application" of the Supreme Court's

precedents if the state court correctly identifies the governing legal principle, but applies it to the facts of the petitioner's case in an objectively unreasonable manner, *Brown v. Payton*, 544 U.S. 133, 134 (2005), or "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams v. Taylor*, 529 U.S. 362, 407, (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fair-minded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). The petitioner must show that the state court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Id*. at 103.

When reviewing a claim under § 2254(d), any "determination of a factual issue made by a State court shall be presumed to be correct [,]" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Burt v. Titlow*, 571 U.S. 12, 18 (2013) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.") (quoting *Wood v. Allen*, 558 U.S. 290, 293 (2010)).

Even if a petitioner meets AEDPA's "difficult" standard, he must still show that any constitutional error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As the Supreme Court recently explained, while the passage of AEDPA "announced certain new conditions to [habeas] relief," it didn't eliminate *Brecht's* actual-prejudice requirement. *Brown v. Davenport*, —— U.S. ——, 142 S. Ct. 1510, 1524, 212 L.Ed.2d 463 (2022). In other words, a habeas petitioner must satisfy *Brecht*, even if AEDPA applies. *See id.* at 1526 ("[O]ur equitable precedents remain applicable 'whether or not' AEDPA applies.") (*citing* Fry v. Pliler, 551 U.S. 112, 121, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007)). In short, a "federal court must deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to grant relief, a court must find that the petition has cleared both tests." *Id*. at 1524.

4

As discussed *supra*, for the deferential § 2254(d) standard to apply there must have been an "adjudication on the merits" in state court.  An adjudication on the merits does not require that there be an opinion from the state court explaining the state court's reasoning.  *Richter*, 562 U.S. at 98.  "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Id*. at 99.  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  *Id*. at 99-100.  This presumption applies whether the state court fails to discuss all the claims or discusses some claims but not others.  *Johnson v. Williams*, 568 U.S. 289, 293, 298-301 (2013).

While such a decision is an "adjudication on the merits," the federal habeas court must still determine the state court's reasons for its decision to apply the deferential standard.  When the relevant state-court decision on the merits is not accompanied by its reasons,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning.  But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

*Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court "looks through" the silent state court decision "for a specific and narrow purpose—to identify the grounds for the higher court's decision, as AEDPA directs us to do."  *Id*. at 1196.

### III.    RELEVANT FACTUAL BACKGROUND

Petitioner was charged by Information with first-degree murder (count 1, Penal Code, §§ 187, 189); destruction or concealment of evidence (count 2, Penal Code § 135); and the enhancement that during the commission of the murder, defendant personally discharged a firearm causing the death of another person (Penal Code, § 12022.53(d)).  (Doc. No. 18-1 at 77-79).  The jury convicted Petitioner of the lesser-included offense of second-degree murder and destroying evidence.  (Doc. No. 18-2 at 9-18).

The Court adopts the pertinent facts concerning the underlying offenses, as summarized by the California Fifth District Court of Appeal on direct appeal.  (Doc. No. 18-18).  A presumption of correctness applies to these facts.  *See* 28 U.S.C. § 2254(e)(1); *Crittenden v. Chappell*, 804 F.3d 998, 1010-11 (9th Cir. 2015).

## FACTS

*Background*

The incident underlying this case involved several people, many of whom are related and share a last name. We begin by setting forth the relationships and living arrangements of the people involved. We will use first and/or last names as clarity dictates throughout this opinion.

In February 2015, Alexis Espinoza lived at a home on Fifth Street in Delano (the "Espinoza residence"). The following people also lived at the Espinoza residence: Alexis's mother; Alexis's sister Samantha Espinoza and her boyfriend Jesse Sandoval; Alexis's other sister Sabrina Espinoza and her boyfriend Adrian Garner; and several children.

At the same time, in February 2015, defendant lived at a home on 19th Avenue in Delano (the "Martinez residence"). The following people also lived at the Martinez residence: defendant's wife Sabrina Martinez (who was also Alexis's aunt); defendant's mother-in-law Francis Martinez; defendant's brother-in-law Arcadio Martinez [N.2] and his children.

> [N.2] According to Alexis, Arcadio "would stay" at the Martinez residence but "wasn't officially living there."

One of Arcadio's children was named Angel Martinez. Angel Martinez had a friend, also named Angel. Several witnesses and the parties on appeal refer to Angel Martinez as "Cousin Angel" and to his friend as "Friend Angel." We will do the same.

Witnesses testified that Arcadio, Cousin Angel, Friend Angel, and Garner were gang members.

*Percipient Witnesses' Version of Events*

On the evening of February 14, 2015, several people gathered at the Espinoza residence.[N.3] Defendant and his wife Sabrina Martinez arrived between 8:00 and 9:00 p.m.

> [N.3] Espinoza rejected the term "party," in favor of the following description: "What it was was a few of my friends had came over and a few of my family members had come over after they had did their Valentine's Day things with their significant others, since my birthday was the day before."

At one point in the evening, defendant began "ranting" about how younger gangsters "aren't really gangsters." Defendant said younger gangsters are "kind of fake," "don't have any respect, and they "do stuff under peer pressure."

Later that evening, while still at the Espinoza residence, defendant confronted Friend Angel about his tattoo with four dots under his eye. Friend Angel "got upset" and said something that defendant did not like. An altercation began, involving defendant, Friend Angel and Arcadio. One witness said the altercation involved "shoving" or "pushing," while another said the "altercation" was "[j]ust arguing." The witness who described "shoving," said that defendant and Arcadio were going "back and forth" shoving each other. Then, Friend Angel "hopped in," which resulted in "[m]ore pushing."

Alexis Espinoza and Sabrina Martinez broke up the fight. Several people then forcefully removed defendant from the house. As he was pushed out the front door, defendant said to Arcadio, "You stupid mother f[**]ker. I'm going to get you. Just wait and see. I'm going to get you." Another witness heard defendant say he would come back and hurt people in the house. Specifically, he said, "I will be back; so you guys watch out."[N.4]

    [N.4] The witness apparently did not tell responding Detective Scott about this comment at the scene or in an interview days later.

Sabrina Martinez told defendant they were going to talk about his behavior after they got home. They then left together. Later, Sabrina Martinez returned without defendant. She tried to get Arcadio to come outside of the house, claiming she was "trying to make peace." However, Samantha wondered "why couldn't they talk to him inside the house," if all they really wanted to do was talk. Sabrina Martinez eventually said, "Just face him, you scared mother f[**]ker. Be a man and face him."

Sabrina Martinez and Samantha began arguing. Sabrina Martinez yelled at Samantha Espinoza "telling her to mind her own F[']ing business and just calling her like a bitch and a whore and other stuff." Alexis shoved Sabrina Martinez, who responded by "sock[ing]" her in the nose. As Alexis tended to her nose, Sabrina Martinez and Samantha started to physically fight one another.

Sabrina said, "He's pissed and he's going to come back with this and f[**]k all you guys."[N.5] Sabrina Martinez was "ejected" from the house and began pacing on the sidewalk in front of the house. Around the same time, Garner, Sandra Ortiz (Garner's sister), and Humberto Ortiz (Sandra's husband) arrived at the residence. Garner was a Norteño gang member.

    [N.5] The witness who testified to hearing the statement never told officers about it.

7

A witness saw Sabrina Martinez on a cell phone, and heard her say, "You better hurry up, these mother f[\*\*]kers think they are going to laugh at us." While still on the phone, Sabrina Martinez also made a comment "toward" the Espinoza residence saying, "We are going to come back and shoot all you mother f[\*\*]kers."[N.6]

> [N.6] When Officer Ruben Campos interviewed Sandra Ortiz shortly after the incident, she did not mention any threats made by Sabrina Martinez at the residence or on her cell phone.

Samantha received a call from Anthony Martinez – who lived with defendant – saying defendant "came for the gun, and he's on his way back." According to Alexis, the Espinoza and Martinez residences are "[l]ike a ten-minute car ride" apart.

Samantha informed the other people at the Espinoza residence, who were trying to lock up the house. Samantha heard Sandoval tell Garner, "I have you," or "I got your back." Garner responded, "No, carnal, let me handle it."[N.7] The two then "bump[ed] heads."

> [N.7] According to Sandoval, "carnal" means "brother."

Garner opened the front door, and defendant was standing there. Defendant said, "What are you looking for, bro? Are you looking for this?" and pulled out a gun. Garner did not have a gun in his hand at the time, but one was later found in his waistband. Defendant tried to walk in with the gun, but Garner tried to push him out. The "back and forth" lasted less than a minute before the gun defendant was holding discharged. Garner looked shocked, his knees buckled, and he fell. Defendant ran away and got into his car. As defendant drove away, someone fired several shots at his car.

Sometime later, a group of more than five Norteños came to the Espinoza residence.

Several nurses initially approached the area to render assistance. One of the nurses saw three or four men jumping and hollering in the driveway. It appeared the men had guns in their waistbands.

Several of the nurses turned back, and only one nurse continued to approach the scene in order to render aid to Garner. There was a shotgun next to Garner's body, which she had to move to render aid. She also saw that Garner had a gun "in his pants." A responding officer testified the gun found in Garner's waistband was positioned so that it would not have been visible unless Garner lifted his shirt.

Garner died, with a bullet having pierced his heart.

*Toxicologist*

A toxicologist testified that Garner's blood-alcohol concentration was 0.038 percent, and that the levels of Delta 9-THC in his blood indicated Garner was under the effect of marijuana.

Other results indicated Garner had used cocaine sometime within the past few days. The toxicologist could not say whether Garner was "feeling the effects" of cocaine at the time of his death.

*Sabrina Martinez's Version of Events*

Defendant's wife, Sabrina Martinez, testified. She testified that Arcadio had previously "[s]traight up" told her he was a "Northerner" gang member. One night – before the incident at issue here – Arcadio told defendant he was on a "list of Norteños." Arcadio was going to get him off the list so that the Norteños "wouldn't hurt him or beat him up."

*Night of the Incident*

On the night of the incident, Sabrina Martinez said defendant accompanied her to the Espinoza residence around 10:00 p.m. While in the living room of the residence, defendant got into an argument with Arcadio. Defendant told Arcadio he should be a better father and a better son.

Later, defendant became involved in another argument away from the living room. Sabrina Martinez was "sure" defendant was arguing with Arcadio and assumed the argument had been taking place in the backyard. Sabrina Martinez did not hear what was said during this argument. The argument caused several people to "throw[ ]" defendant out of the house. Sabrina Martinez decided to leave with defendant. She did not hear defendant say anything as they were leaving.

Sabrina Martinez and defendant drove around the block in their car. Sabrina Martinez told defendant they needed to talk to Arcadio to "clear the air." They then returned to the Espinoza residence. Sabrina Martinez got out of the car, while defendant remained in the vehicle. She tried to get Arcadio to come outside so they could "clear the air." Arcadio refused to come outside. Alexis then approached Sabrina Martinez, and "got into her face." Sabrina Martinez then hit Alexis in the nose. Sabrina Martinez then felt something hit her in the head, and she could not see for a moment. During this time, Sabrina Martinez was yelling indecipherably.

A group of people tried to "force" Sabrina Martinez "out." When she reached the front gate of the house, defendant and the car were no longer there. She had left her phone in the car, so she walked to her mother-in-law's house.

Sabrina Martinez admitted she was drunk while at the Espinoza residence.

*Defendant's Version of Events*

Defendant testified. [N.8] Defendant associated with Northerner gang members in his neighborhood when he was a teenager. Before he turned 20, he "left that stuff alone" and "never looked back."

9

1            [N.8] Defendant began his testimony by admitting he stole
                     electronics from Sears 12 years prior.

Arcadio told defendant he was a Northerner. Arcadio asked defendant if he was "good," meaning to ask whether defendant was an active gang member. Defendant said, "No, Brother." Arcadio said he would talk to people "high up in the gang" to get defendant removed from the gang's "no-good list." Arcadio said that if defendant was not removed from the list, he would be killed.

On the night of February 14, 2015, defendant was conversing in the backyard when he saw Arcadio, Cousin Angel and Friend Angel come in through the front door. Arcadio came straight to the backyard and said to defendant, "What's up now?" Arcadio told defendant he was "a no good piece of shit." Defendant said Arcadio needed to take care of his family and stop his gang banging "dumb shit." Then, Friend Angel "g[o]t in [defendant's] face" and told defendant to keep the Westside out of his mouth. Defendant noticed some "dudes standing up, getting off the couch" who looked "like they were ready to jump in, too."

Arcadio and Friend Angel started pushing defendant out of the house. Defendant told Arcadio he was going to "whip his ass" when he came home. Defendant "mentioned nothing about no firearms." Defendant never said he would come back and shoot anyone at the house.

Sabrina Martinez escorted defendant to the car. The two talked about how they need to "fix" the situation with Arcadio because they lived together. Sabrina Martinez got out of the car to apologize to the people at the Espinoza residence. She told defendant to stay in the car.

Sabrina Martinez went inside the Espinoza residence and the door closed behind her. Two or three seconds after she went inside, defendant heard her scream through an open window. Defendant feared for his wife. Defendant "floored it" in his car and drove to the Martinez residence. Defendant ran through every stop sign and stoplight he came across. When he got to his house, he went into his room and retrieved a .40-caliber handgun. Defendant then drove back to the Espinoza residence.

Defendant got out of his car, but left the engine running. He planned to get his wife and "get the hell out of there." Defendant approached the home from outside, and said, "Where's my wife at?" One of his nieces said, "She ain't here." Defendant took that as his "cue" to "get out of town."

Defendant had his pistol in his right hand, pointing it down. He turned away to leave, when Garner grabbed defendant's gun by the barrel. The two "struggle[d] for control" of the gun. During the struggle, the gun then "went off." Defendant was "in shock that it went off." Garner had a "look of shock on his face." Defendant did not know the bullet had struck Garner.

1

2

3

4

5

6

Jesse Sandoval began to pursue defendant. Defendant pushed him away and started running. Defendant got into his car, but Sandoval prevented him from putting the car into drive. As the two struggled, defendant heard gunshots. Sandoval was "stunned because of the loudness" of the gunshots, enabling defendant to put the car into drive, causing Sandoval to fall out of the car.

Defendant drove away, and eventually dismantled his gun and threw out the barrel, clip and "the pen that holds the gun together." Defendant learned Garner died and turned himself in the next morning.

7

(Doc. No. 18-18 at 4-11).

8

## IV.   ANALYSIS

9

10

11

Petitioner raised his insufficiency of evidence claim (Ground 4) on direct appeal (F074033).  (Doc. No. 18-17 at 5-7).  The Fifth Appellate District Court denied the ground.  (Doc. No. 18-18 at 11-14).  The California Supreme Court denied any relief.  (Doc. No. 18-20).

12

13

14

15

16

17

18

19

Thereafter, Petitioner raised all grounds (Grounds 1-4) in a state petition for writ of habeas corpus filed in the Kern County Superior Court (HC-16486A).  (Doc. No. 18-21).  The Kern County Superior Court denied relief in a reasoned decision.  (Doc. No. 18-22).  Petitioner raised the same grounds in his state petition for writ of habeas corpus to the Fifth Appellate District Court (F081359).  (Doc. No. 18-23).  The Fifth Appellate District Court summarily denied relief.  (Doc. No. 18-24).  Petitioner also raised the same grounds in a state petition for writ of habeas corpus to the California Supreme Court (S265124).  (Doc. No. 18-25).  The California Supreme Court summarily denied the petition.  (Doc. No. 18-26).

20

21

22

Thus, each of the grounds raised in the Petition are exhausted.  The Court looks through to the last state court reasoned decision in evaluating each of Petitioner's claims under the deferential standard of review.  *Wilson*, 138 S. Ct. at 1192.

23

### A.  Ground 1: *Brady* Violation

24

25

26

27

28

In his first ground for relief, Petitioner argues that the state failed to turn over favorable evidence in violation of his Fifth Amendment due process rights and *Brady v. Maryland*, 373 U.S. 83 (1963).  (Doc. No. 1 at 5).  Specifically, Petitioner claimed that the prosecution was in possession of his Sprint cell phone bill, which he argues proved that his wife did not call him the night of the shooting, thus, contradicting Sandra Ortiz' testimony.  (*Id*. at 21).  Specifically,

Petitioner states that, as reflected on the Sprint cell phone bill attached to his Petition (Doc. No. 1 at 34-52, Exhibit 2), his cell phone number was 661-778-2344 and his wife's number was 661-375-6704.  Petitioner argues his Sprint cell phone bill shows that his wife's cell phone did not call his cell phone on the night of February 14, 2015.  (*Id.* at 21).  Respondent argues that the state court reasonably rejected the claim because the Sprint bill was not authenticated, there was no evidence that the prosecution had the Sprint cell phone bill and defense did not, and a fair-minded jurist could conclude that the evidence was not material as it did not contradict Ortiz's testimony, and arguably confirmed it.  (Doc. No. 17 at 24).

### 1.  State Court Decision

Petitioner raised his *Brady* claim in his state habeas petition and submitted a copy of the Sprint bill with his state habeas petition.  (Doc. No. 18-21 at 4, 14-17, Exhibit 2).  The last reasoned decision on Petitioner's *Brady* claim was issued by the Kern County Superior Court.  The Court looks through the summary denials of this claim by the court of appeal and California Supreme Court.  The superior court found the claim factually not supported by record, and, alternatively harmless.

**Any Failure of the State to Turnover Evidence is Harmless.**

Petitioner claims that the prosecution had received the phone billing records for his and his wife's cell phones prior to trial and yet did not turn them over to Petitioner.

The receipt of the phone records was actually noted on the Court's docket in March and April of 2015. In September of 2015, the trial court addressed a discovery motion by Petitioner's counsel wherein the prosecution agreed that all exculpatory was to be produced to Petitioner's counsel. There is no reason to presume that such delivery of documents did not contain the cell phone bill statements.

Petitioner has not provided any evidence in support of his contention that the cell phone bills were not received by his counsel.

Even if the cell phone records had not been delivered, the failure to provide such was harmless. The cell phone billing records only provide evidence that Petitioner and his wife were not billed for any calls between their respective cell phones that night. Contrary to Petitioner's position, it does not prove that the phone call never took place.

(Doc. No. 18-22 at 3).  As noted, both the state appellate and supreme court summarily denied Petitioner's state habeas petitions raising this same ground without opinion.  (Doc. Nos. 18-24, 26).

### 2.  Analysis

"Under Brady, prosecutors are responsible for disclosing 'evidence that is both favorable to the accused and material either to guilt or to punishment.'"  *Browning v. Baker*, 875 F.3d 444, 459 (9th Cir. 2017) (quoting *United States v. Bagley*, 473 U.S. 667, 674 (1985)).  "To establish a *Brady* violation, [Petitioner] must show: '(1) the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the government, regardless of whether the suppression was willful or inadvertent; and (3) the evidence is material to the guilt or innocence of the defendant.'"  *Sanders v. Cullen*, 873 F.3d 778, 802 (9th Cir. 2017) (quoting *United States v. Sedaghaty*, 728 F.3d 885, 899 (9th Cir. 2013)).

The superior court's rejection of Petitioner's *Brady* claim was not objectively unreasonable.  Despite not citing to *Brady*, the court found that Petitioner could not demonstrate the second *Brady* element.  The court's records revealed that the cell phone records were listed in the discovery on the court's docket.  (See Doc. No. 18-21 at 19, "Record of Case Events" reflecting "Subpoenaed Records Received From Sprint" on 03/17/15, 04/01/15 and 04/03/15). Further the issue of discovery was subject to a motion, that was later withdrawn by the defense. (*See* Doc. No. 18-1 at 84-128).[3]  And the record reveals the state agreed to re-produce all exculpatory evidence to the defense.  (*Id*. at 105, ¶ 12.).  There is no evidence to support Petitioner's claim that the state did not turn over the Sprint cell phone bill (to the extent it even constituted exculpatory evidence) to defense counsel or that defense counsel was unaware of the existence of the Sprint cell phone records.  Thus, Petitioner cannot demonstrate that the state suppressed the Sprint cell phone records.  Additionally, Petitioner does not explain why his own Sprint cell phone bill would not have been equally available to him.  Indeed, "[t]he prosecution is

---

[3] The discovery dispute arose due to Petitioner previously being represented by private counsel and subsequently being represented by the public defender, who apparently did not receive discovery from private counsel.  Thus, the state recreated the discovery files and defense counsel withdrew the motion.

1    under no obligation to turn over materials not under its control." *United States v. Aichele,* 941

2    F.2d 761, 764 (9th Cir.1991). Thus, where a petitioner "had equal access" to the records in

3    question he "cannot now complain that the State violated *Brady* at the habeas corpus stage 'by not

4    bringing the evidence to [his] attention.'" *Jones v. Ryan*, 733 F.3d 825, 838 (9th Cir. 2013)

5    (quoting *Raley v. Ylst,* 470 F.3d 792, 804 (9th Cir.2006) (internal quotation marks omitted,

6    finding no *Brady* violation where the petitioner "possessed the salient facts regarding the

7    existence of the records that he claims were withheld").

8         Alternatively, the superior court found that Petitioner could not demonstrate the first

9    *Brady* element—that the Sprint bill was exculpatory.  Specifically, the state court determined that

10   the cell phone records were not exculpatory nor of impeaching value because the records did not

11   contradict Ms. Ortiz' testimony or disprove that the phone call took place.  Evidence is "material"

12   only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the

13   result of the proceeding would have been different." *Strickler v. Greene*, 527 U.S. 263, 280

14   (1999) (internal quotation marks omitted).  "A 'reasonable probability' of a different result

15   [exists] when the government's evidentiary suppression undermines confidence in the outcome of

16   the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (internal quotation marks omitted).

17        Petitioner argues the cell phone records disprove Ms. Ortiz's testimony that she saw and

18   overheard Petitioner's wife talking on a cell phone talking to someone and urging the person to

19   hurry back.  A review of the Sprint bill reflects that Petitioner's cell phone (661-778-2344) placed

20   two calls to his wife's cell phone (661-375-6704) on the evening on February 14, 2015—one at

21   11:16 p.m. and one at 11:18 p.m.  (Doc. No. 1 at 47).  According to the record, the shooting took

22   place on February 14, 2015 at approximately 11:30 p.m.  (Doc. No. 18-7 at 70:12-13; 71:16-28;

23   71:3-9).  Critical here, however, is that Ms. Ortiz testified only that she overheard Petitioner's

24   wife speaking to someone, but she did not specify with whom Petitioner's wife was speaking.

25   (Doc. No. 18-8 at 174:2-3).  Thus, the state court's rejection of this ground finding that the cell

26   phone bills do not disprove Ortiz' testimony of what she overheard Petitioner's wife saying to

27   someone on a cell phone is reasonably objective.

28        And finally, as discussed more fully *infra*, even assuming that the cell phone bills had

14

been introduced to impeach Ortiz's testimony, given the ample evidence that Petitioner acted with malice, there is not a reasonable probability that the result of the proceedings would have been any different. *United States v. Bagley*, 473 U.S. 667 (1985). Thus, the undersigned finds that that the state court's rejection of this ground was not contrary to nor an unreasonable application of federal law, nor based on an unreasonable application of the facts so Petitioner is not entitled to relief on his *Brady* claim.

### B. Ground 2: Prosecutorial Misconduct

Petitioner contends he was denied due process and a fair trial because the state prosecutor committed prosecutorial misconduct by knowingly putting on perjured testimony. (Doc. No. 1 at 7). In support, Petitioner again relies upon the Sprint cell phone records, which he claims were in the prosecutor's possession, dispute Ms. Ortiz' testimony and points to the fact that the prosecutor nonetheless permitted Ms. Ortiz to testify about statements she overheard by Petitioner's wife while on a cell phone. (*Id*. at 23-24). In response, Respondent argues that the state court's rejection of the claim was not objectively unreasonable. (Doc. No. 17 at 33).

### 1. State Court Decision

Petitioner raised his prosecutorial misconduct claim in his state habeas petition. (Doc. No. 18-21 at 5, 41-42). The last reasoned decision on Petitioner's prosecutorial misconduct claim was issued by the Kern County Superior Court. The Court looks through the summary denials of this claim by the court of appeal and California Supreme Court.

> **There is No Evidence That Testimony Was Known to be False.**
>
> Petitioner claims that the testimony of Sandra Ortiz regarding overhearing his wife talk on the cell phone constituted perjury, and the prosecution knew it before they put Sandra Ortiz on the stand. Even assuming the testimony was false, Petitioner has not provided any evidence that the prosecution knew it was false when Sandra Ortiz was put on the stand.
>
> The veracity of Sandra Ortiz's story was fully addressed in the trial and on appeal. The Court of Appeal decision even provides in a footnote that the fact that Sandra Ortiz did not mention overhearing the phone conversation when she was first interviewed by police shortly after the incident. The credibility or lack thereof of Sandra Ortiz was addressed at trial. The jury had all the evidence it needed to determine if Sandra Ortiz was being truthful in her testimony.

1
2
3
4

> Finally, there is no new evidence that Sandra Ortiz's story is any weaker now then it was at the time of trial. The cell phone records only provide evidence that Petitioner and his wife were not billed for any calls between their respective cell phones that night. Contrary to Petitioner's assertion, the new evidence does not "prove" that the call testified to by Sandra O1tiz never took place.

5   (Doc. No. 18-22 at 3).

6   **2.   Analysis**

7   "[I]mplicit in any concept of ordered liberty," is that the State may not use false evidence

8   to obtain a criminal conviction.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (internal citation

9   omitted).  Additionally, a state violates a criminal defendant's right to due process when, although

10  not soliciting false evidence, it allows false evidence to go uncorrected when it appears.  *See*

11  *Alcorta v. Texas*, 355 U.S. 28 (1957). To prevail on *Napue* claim, "the petitioner must show that

12  (1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have

13  known that the testimony was actually false, and (3) ... the false testimony was material." *Hayes*

14  *v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (internal quotations and citations omitted).

15  Unlike a *Brady* violation, because cases of prosecutorial misconduct involve "corruption

16  of the truth-seeking function of the rial process" a *Napue* inquiry requires only that there be "any

17  reasonable likelihood that the false testimony could have affected the judgment of the jury."

18  *Dickey v. Davis*, 69 F.4th 624, 636-37 (9th Cir. 2023) (quoting *U.S. v. Agurs*, 427 U.S. 97, 103–

19  04 (1976); *accord Hayes v. Brown*, 399 F.3d 972, 985 (9th Cir. 2005) (en banc).

20  Here, without citing to any caselaw, the state court disposed of this ground on the basis

21  that Petitioner failed to produce conclusive evidence that Ms. Ortiz's trial testimony was false or

22  that the prosecutor knew it was false.  The state court further noted that Ortiz was subject to

23  cross-examination.  Because the state court adjudicated this claim on the merits, to find relief in

24  the federal court Petitioner must show that the state court's ruling "was so lacking in justification

25  that there was an error well understood and comprehended in existing law beyond any possibility

26  for fairminded disagreement." *Richter*, 562 U.S. at 103.

27  The Court agrees with the state superior court that Petitioner offers no conclusive

28  evidence that Ms. Ortiz's trial testimony was dishonest or that the prosecutor knew it was

dishonest.  As noted above, the Sprint cell phone bill does did not disprove Ortiz's testimony concerning the statements' she attributed to Petitioner's wife when she claimed to have overheard Petitioner's wife speaking to someone on a cell phone.  To the extent that Ms. Ortiz's testimony was not supported by other witnesses or the fact that she failed to disclose overhearing the statements that evening to police, mere inconsistencies in the evidence does not constitute the knowing use of perjured testimony by the prosecutor.  *United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002); *see also United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997).  Here, the record does not support the first element of a *Napue* violation—that Ortiz's testimony was false.  Furthermore, even if Petitioner can show Ortiz testified falsely, there is no evidence that the state prosecutor had any reason to believe that Ortiz's testimony was false.  Thus, the state court's rejection of this claim was objectively reasonable and Ground Two is without merit.

### C.  Ground 3(a) and (b): Ineffective Assistance of Trial and Appellate Counsel

In his third ground Petitioner contends that both trial and appellate counsel rendered constitutionally ineffective assistance.[4]  (Doc. No. 1 at 8).  Petitioner faults his trial counsel for (i) failing to use the Sprint cell phone bill in his defense; (ii) failing to conduct a reasonable pre-trial investigation regarding the Sprint cell phone bill; and (iii) failing to object to Sandra Ortiz's second statement.  (*Id.*, 8, 25-26).  Petitioner faults his appellate counsel for (i) failing to use the Sprint cell phone fill on direct appeal, which Petitioner claims was "new found evidence"; and (ii) for failing to file a state petition for writ of habeas corpus regarding the Sprint cell phone bill.  (*Id.*).  Petitioner attaches correspondence between him and appellate counsel to his Petition in support of his claim.  (Doc. No. 1 at 65-73, Exhs. 8-11).  Respondent argues the state court's rejection of Petitioner's claims regarding trial counsel was objectively reasonable.  (Doc. No. 25 at 37-40).  Respondent similarly argues that the state court's rejection of the claim regarding appellate counsel was objectively reasonable because the Sprint cell phone was outside the record on appeal so it could not have been raised on direct appeal and Petitioner does not have a constitutional right to appellate counsel on collateral appeal.  (*Id.* at 40-41).

---

[4] Although the state court addressed the grounds together, Petitioner raised each ground as distinct sub-grounds in Ground Three of his Petition.  (Doc. No. 1 at 8).

**1. State Court Decision**

Petitioner raised his ineffective assistance of trial and appellate counsel claim in his state habeas petition and submitted a copy of the Sprint bill with his state habeas petition. (Doc. No. 18-21 at 5, 41-42). The last reasoned decision was issued by the Kern County Superior Court. The Court looks through the summary denials of this claim by the court of appeal and California Supreme Court.

**Trial and Appellate Counsel Did Not Provide Ineffective Assistance.**

"An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471; accord, *Strickland v. Washington* (1984) 466 U.S. 668,687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (*Strickland*).) Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review. (*In re Thomas, supra*, 37 Cal.4th at p. 1256, 39 Cal.Rptr.3d 845, 129 P.3d 49.)

To obtain relief, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra*, 466 U.S. at p. 694, 104 S.Ct. 2052; accord, *People v. Rices* (2017) 4 Cal.5th 49, 80, 226 Cal.Rptr.3d 118, 406 P.3d 788; *Gay I, supra*, 19 Cal.4th at p. 790, 80 Cal.Rptr.2d 765, 968 P.2d 476.)

Counsel's performance is evaluated according to well-established standards.

"Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." (*Strickland, supra*, 466 U.S. at p. 688, 104 S.Ct. 2052.) "These basic duties neither exhaustively define the obligations of counsel nor form a checklist for judicial evaluation of attorney performance." (*Ibid.*) Rather, "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness,' "as measured by " 'prevailing professional norms.' "(*Wiggins v. Smith, supra*, 539 U.S. at p. 521, 123 S.Ct. 2527, *quoting Strickland*, at p. 688, 104 S.Ct. 2052.)

When applying this standard, we ask whether any reasonably competent counsel would have done as counsel did. (*In re Reno* (2012) 55 Cal.4th 428, 465, 146 Cal.Rptr.3d 297, 283 P.3d 1181.) Counsel's performance "is assessed according to the prevailing

18

norms at the time." (*In re Thomas*, supra, 37 Cal.4th at p. 1257, 39 Cal.Rptr.3d 845, 129 P.3d 49.)

Judicial review of counsel's performance is deferential; to establish deficient performance, the defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland*, at p. 689, 104 S.Ct. 2052.)

As recently stated by the California Supreme Court in the case of *In re Gay*, (2020) 8 Cal.5th 1059:

> Because a petition for a writ of habeas corpus is a collateral attack on a presumptively final criminal judgment, Petitioner bears the burden of proving his entitlement to relief by a preponderance of the evidence. (*In re Cowan* (2018) 5 Cal.5th 235,243,234 Cal.Rptr.3d 75,419 P.3d 535; *In re Price* (2011) 51 Cal.4th 547, 559, 121 Cal.Rptr.3d 572, 247 P.3d 929.) The trial court's factual findings are "entitled to great weight where supp01ied by substantial evidence." (*In re Hamilton* (1999) 20 Cal.4th 273,296, 84 Cal.Rptr.2d 403, 975 P.2d 600; accord, *In re Welch* (2015) 61 Cal.4th 489,501, 189 Cal.Rptr.3d 179,351 P.3d 306.) Those findings are not, however, conclusive, and "we can depart from them upon independent examination of the record even when the evidence is conflicting." (*Hamilton*, at p. 296, 84 Cal.Rptr.2d 403, 975 P.2d 600; *accord, Cowan*, at p. 243,234 Cal.Rptr.3d 75,419 P.3d 535.) The ultimate responsibility for determining whether Petitioner is entitled to relief rests with this court. (*In re Thomas* (2006) 37 Cal.4th 1249, 1256-1257, 39 Cal.Rptr.3d 845, 129 P.3d 49.)

Petitioner claims that both his trial and appellate counsel were ineffective because they both failed to present the cell phone billing records in support of the position that Petitioner had no malice of forethought when the victim was killed.

Petitioner further faults his trial counsel for not investigating the cell phone billing records himself and failing to object to the testimony of Sandra Ortiz.

Petitioner does not provide any evidence that his trial counsel failed to investigate the cell phone records or that counsel did not actually receive the records from the prosecution and strategically decided not to introduce the evidence. The evidence presented at trial regarding the malice of forethought of Petitioner included the testimony of Petitioner himself. It is unlikely that the addition of the cell phone records into evidence in the case would have swayed the jury away from the verdict against Petitioner.

The testimony of Sandra Ortiz about the cell phone call was objected to at trial and her testimony was deemed admissible as an exception to the hearsay rule by the Court of Appeals. There was no

1

> failure by counsel in allowing the testimony to proceed
> unquestioned.

2

3

> As described below, Sandra Ortiz's testimony also was not the only
> evidence of Petitioner's malice of forethought. Everything about the
> cell phone call by Petitioner's wife could be ignored and still there
> would be sufficient evidence in support of the verdict.

4

5

> Petitioner has not shown that there is a reasonable probability that
> the result of the proceeding would have been different if the cell
> phone billing records had been introduced at trial.

6

7

> The Court finds Petitioner fails to meet his burden to show a prima
> facie case for habeas corpus relief.

8

9

(Doc. No. 18-22 at 4-5).

10

### 2.   Analysis

11

Criminal defendants have a right to counsel at trial and on direct appeal.  U.S. Const.

12

Amend VI.  Claims alleging that trial or appellate counsel were constitutionally ineffective

13

requires the Court to engage in the two-step analysis set forth in *Strickland v. Washington*, 466

14

U.S. 668 (1984).  Under the first prong of that test, the petitioner must prove that his attorney's

15

representation fell below an objective standard of reasonableness.  *Id*. at 687-88.  To demonstrate

16

deficient performance, the petitioner must show his counsel "made errors so serious that counsel

17

was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id*. at

18

687; *Williams v. Taylor*, 529 U.S. 362, 391 (2000).  In reviewing trial counsel's performance,

19

however, "counsel is strongly presumed to have rendered adequate assistance and made all

20

significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at

21

690; *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003).  Only if counsel's acts and omissions,

22

examined within the context of all the circumstances, were outside the "wide range" of

23

professionally competent assistance, will petitioner meet this initial burden.  *Kimmelman v.*

24

*Morrison*, 477 U.S. 365, 386 (1986); *Strickland*, 466 U.S. at 689-90.

25

Under the second part of *Strickland's* two-prong test, the petitioner must show that he was

26

prejudiced by counsel's conduct.  466 U.S. at 694.  Prejudice is found where there is a reasonable

27

probability that, but for his counsel's errors, the result would have been different.  *Id*.  The errors

28

must not merely undermine confidence in the outcome of the trial but must result in a proceeding

1    that was fundamentally unfair. *Williams*, 529 U.S. at 393 n.17; *Lockhart v. Fretwell*, 506 U.S.

2    364, 372 (1993).  The petitioner must prove both prongs:  deficient performance and prejudice.  A

3    court need not, however, determine whether counsel's performance was deficient before

4    determining whether the petitioner suffered prejudice as the result of the alleged deficiencies.

5    *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of

6    lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

7                              **a.  Trial Counsel**

8            Here, the state court correctly identified and applied the two-prong *Strickland* analysis in

9    disposing of Petitioner's trial and appellate ineffective assistance of counsel claims.  The state

10   court disposed of Petitioner's claims that trial counsel was constitutionally ineffective on both

11   prongs.  First, the state court found no evidence that trial counsel was unaware of the Sprint cell

12   phone bill.  As discussed *supra* at 13, the trial court docket reflected that the cell phone bills were

13   listed in the discovery on the court's docket.  Although "counsel has a duty to make reasonable

14   investigations or to make a reasonable decision that makes particular investigations unnecessary,"

15   *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91), the state

16   court record does not support Petitioner's claim that his trial lawyer abdicated this duty.  Thus,

17   the state court's conclusion that Petitioner did not affirmatively show counsel "failed" to do what

18   he may have done and did not "establish" deficiency was reasonable.  *Burt v. Titlow*, 134 S. Ct.

19   10, 17 (2013).

20           It is equally likely that trial counsel made a strategic decision not to use the Sprint cell

21   phone bill as it did not unambiguously impeach Ms. Ortiz's testimony.  Instead, defense counsel

22   chose to challenge Ortiz's testimony by introducing evidence that Ortiz did not mention

23   overhearing any conversation by Sabrina Martinez when she was first interviewed by police on

24   the night of the incidence (Doc. No. 18-10 at 21:8-28, at 22:1-2).  Trial counsel also elicited from

25   Petitioner on direct examination that his wife had left her cell phone in his car after he had been

26   ejected from the party.  (Doc. No. 18-10 at 104:11-18).  And trial counsel elicited testimony from

27   Petitioner's wife, Sabrina Martinez, that she did not have her call phone on her after she left the

28   house the second time after getting into a fight with her niece.  (Doc. No. 18-9 at 216:1-12).

                                        21

1    Regardless, Petitioner cannot prevail on the prejudice prong given the weight of evidence even if

2    he can show counsel was deficient for not using the cell phone bill to discredit Ortiz's testimony.

3          Finally, the record reflects that trial counsel did raise a hearsay objection to Ortiz's first

4    statement that was overruled.  (Doc. No. 18-8 at 173:9-28, at 174:1-5).  Although counsel did not

5    object to the Ortiz's second statement (Doc. No. 18-8 at 174: 11-20) and despite not being

6    preserved, both of Ortiz's statements were raised on direct appeal and the state appellate court

7    found both statements were properly admitted.  (Doc. No. 18-18 at 14-16).  Thus, had trial

8    counsel objected to the second statement, the objection likely would have been overruled.

9    Counsel cannot be deemed defective for failing to raise a futile objection.  *See Miller v. Keeney*,

10   882 F.2d 1428, 1434 (9th Cir.1989) (noting when a petitioner challenges a futile objection, he

11   fails both *Strickland* prongs).

12         Thus, the state court's rejection of Petitioner's ineffective assistance of trial counsel

13   claims was not objectively unreasonable under AEDPA and Petitioner is not entitled to relief on

14   these claims.

15                        **b.  Appellate Counsel**

16         Other than referencing the correct *Strickland* standard and denying relief, the superior

17   court does not further address Petitioner's claim of ineffective assistance of appellate counsel.  To

18   succeed on a claim of ineffective assistance of appellate counsel "the petitioner [must]

19   demonstrate that counsel acted unreasonably in failing to discover and brief a merit-worthy issue.

20   *Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Wildman v. Johnson*, 261 F.3d 832, 841-42 (9th Cir.

21   2001). Further, consistent with *Strickland*, the petitioner must show prejudice, which in the

22   context of appellate counsel means that the petitioner must demonstrate a reasonable probability

23   that, but for appellate counsel's failure to raise the issue, the petitioner would have prevailed in

24   his appeal.  *Moormann v. Ryan*, 628 F.3d 1102, 1106 (9th Cir. 2010).

25         The denial of Petitioner's appellate counsel's claim by the state court was objectively

26   reasonable.  Indeed, as noted by appellate counsel in his September 9, 2019 letter to Petitioner,

27   counsel could not have raised the Sprint cell phone bill on direct appeal because the bill was not

28   introduced at trial and evidence outside of the trial record may not be considered on direct appeal

1  under California law.  (Doc. No. 1 at 73).  Under California law, claims on direct review are

2  limited to issues raised in the record.  *In re Carpenter*, 9 Cal. 4th 634, 646 (1995) ("Appellate

3  jurisdiction is limited to the four corners of the record on appeal.").  *See Shin v. Ndoh*, 2021 WL

4  12143814, at *4 (C.D. Cal. May 27, 2021) (collecting California cases). *see also Franza v.*

5  *Stinson*, 58 F. Supp. 2d 124, 128 (S.D.N.Y. 1999) (appellate counsel is not deficient for not

6  pursuing claims unsupported by the record).  Thus, Petitioner's claims concerning the Sprint

7  phone bill could not be raised on direct appeal because the claim necessarily required a factual

8  development of the record.  Appellate counsel cannot be deemed ineffective for failing to raise a

9  nonmeritorious claim.  *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a

10  futile action can never be deficient performance").

11       Additionally, Petitioner's claim that appellate counsel was ineffective for not raising the

12  Sprint cell phone claim on his behalf via a state habeas petition is without merit because counsel

13  was not appointed to represent Petitioner on collateral review.  (Doc. No. 1 at 73, advising

14  Petitioner his appointment "does not include the investigation and appointment of a habeas

15  petition").  Further, while Petitioner has a right to counsel on direct appeal after a criminal

16  conviction, he has not right to counsel in when seeking "post-conviction" such as in a state habeas

17  petition.  *Coleman v. Thompson*, 501 U.S. 722, 752-57 (1991); *see also Pennsylvania v. Finley*,

18  481 U.S. 551, 555, 557 (1987) ("Postconviction relief . . .  is a collateral attack that normally

19  occurs only after the defendant has failed to secure relief through direct review of his conviction";

20  prisoner has no constitutional right to counsel "when attacking a conviction that has long since

21  become final upon exhaustion of the appellate process").  And because Petitioner "had no

22  constitutional right to counsel, he could not be deprived of the effective assistance of counsel."

23  *Wainwright v. Torna*, 455 U.S. 586, 588 (1982).

24       Thus, Petitioner fails to demonstrate that appellate counsel was deficient for not raising

25  the Sprint phone bill on direct appeal since such evidence was outside the record.  And because

26  Petitioner does not enjoy the right to appellate counsel on collateral post-conviction relief, he

27  cannot show any deprivation of effectiveness by appellate counsel. For these reasons, Petitioner is

28  not entitled to relief on his ineffective assistance of appellate counsel claims.

23

### D.  Ground 4:  Insufficient Evidence of Malice Aforethought

In his final ground for relief, Petitioner claims his due process rights were violated because there was insufficient evidence of malice aforethought for the jury to have convicted him of second-degree murder.  (Doc. No. 1 at 10).  Petitioner argues that absence of self-defense of self or another was not proved beyond a reasonable doubt. (*Id*. at 28).  Further, Petitioner argues that the evidence the jury relied upon included improperly admitted statements that were attributed to his wife because such statements were hearsay and were prejudicial.  (*Id*.).  In response, Respondent argues Petitioner fails to demonstrate that the state court's rejection of this claim was objectively unreasonable.  (Doc. No. 17 at 41-45).

#### 1.  State Court Decisions

Petitioner raised this ground on direct appeal.  (Doc. No. 18-15).  In an opinion undisturbed by the California Supreme Court, the appellate court rejected Petitioner's insufficiency claim in a reasoned decision.

#### Substantial Evidence of Malice was Adduced at Trial

Defendant argues there was insufficient evidence of malice to sustain his conviction for second-degree murder.

#### Law

"Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 133.) Manslaughter is an unlawful killing without malice. (*Ibid*.)

One who kills with "'the actual but unreasonable belief he must defend another from imminent danger of death or great bodily injury – is guilty only of manslaughter.' [Citation.]" (*People v. Trujeque* (2015) 61 Cal.4th 227, 270.) This is called "imperfect defense of others." However, it "is not a true defense, but a shorthand description for a form of voluntary manslaughter. [Citations.]" (*Id*. at p. 271.)

If the issue of imperfect self-defense is properly presented in a murder case, the prosecution must prove the absence of imperfect self-defense beyond a reasonable doubt. (*People v. Rios* (2000) 23 Cal.4th 450, 462.) The parties agree the same rule applies to imperfect defense of others.

Defendant argues the prosecution failed to prove he did not kill with the actual belief he needed to defend himself or his wife.

"In reviewing a challenge to the sufficiency of the evidence..., we review the entire record in the light most favorable to the judgment to determine whether it discloses substantial evidence – that is, evidence that is reasonable, credible, and of solid value – from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Ramirez* (2006) 39 Cal.4th 398, 464.) We "'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.]" (*Ibid.*)

**Application**

We conclude there was substantial evidence from which a reasonable jury could have found that defendant did not kill because of an actual belief in the need to defend himself or his wife.

### 1.  <u>Substantial Evidence of Malice</u>

There was evidence that after allegedly hearing his wife scream in the Espinoza residence, defendant left the property, got into his car, drove to his home, retrieved a gun, and drove back to where he had heard his wife scream. Because of its inherent implausibility, the jury was free to discredit defendant's testimony about why he left to retrieve his gun. As a result, the jury was free to infer that defendant actually left to retrieve the gun because he was angry with Arcadio, Friend Angel and possibly others at the Espinoza residence.

Other evidence bolsters the inference that defendant sought to kill people at the Espinoza residence out of revenge, anger and/or embarrassment rather than to defend himself or his wife. Defendant was physically removed from the Espinoza residence after fighting with Arcadio. As he was pushed out the front door, defendant said to Arcadio, "You stupid mother f[**]ker. I'm going to get you. Just wait and see. I'm going to get you." Another witness heard defendant say he would come back and hurt people in the house. Specifically, he said, "I will be back; so you guys watch out." These statements raise an inference defendant subsequently acted out of anger, not fear.

Defendant's wife, Sabrina Martinez, was also removed from the property after getting into a fight. A witness saw her talking on a cell phone, and heard her say, "You better hurry up, these mother f[**]kers think they are going to laugh at us." While still on the phone, Sabrina Martinez made a comment "toward" the Espinoza residence, saying, "We are going to come back and shoot all you mother f[**]kers." One reasonable inference from this evidence is that Sabrina Martinez was talking to defendant on the phone, and that they discussed shooting people at the Espinoza residence because they were angry that people thought they could laugh at defendant and his wife. That inference supports the jury's conclusion that defendant harbored malice when he shot Garner.

25

## 2. **Defendant's Arguments to the Contrary are Unavailing**

Defendant contends that it would have been reasonable for him to be in fear considering that he knew his wife was in a house with known gang members at least some of whom were hostile; and he knew that gang members can violently escalate situations. Defendant also observes that he did not immediately begin shooting when he arrived back at the Espinoza residence; that events after the shooting confirmed the reasonableness of his fear that gun violence could erupt; and that fleeing the scene and discarding parts of the gun could be explained by "shock" and his desire to escape the people chasing him. At best, defendant's arguments suggest some of the circumstances of that night could also be consistent with imperfect self-defense or imperfect defense of others. Such a contention fails under our substantial evidence standard of review. "'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' [Citation." (*People v. Westerfield* (2019) 6 Cal.5th 632, 713.)

(Doc. No. 18-18 at 11-14).

Petitioner re-raised this ground in his state habeas petitions (Doc. Nos. 18-21, 18-23, 18-25) and it was rejected by the Kern County Superior Court, the Fifth District Court of Appeal and California Supreme Court. (Doc. Nos. 18-22, 18-24, 18-26). The Superior Court, recognizing the ground was already addressed and rejected on direct appeal, concluded that:

[e]ven if the phone call and all statements of Petitioner's wife alleged to have been overheard by Sandra Ortiz were to be ignored, there was still sufficient evidence in support of a finding of malice of forethought by Petitioner.

The evidence of the inference that Petitioner actually sought to kill people at the gathering out of revenge, anger or embarrassment included the fact that Petitioner left the gathering after he had been in a fight and as he left he said; "You stupid mother :f[**]ker. I'm going to get you. Just wait and see. I'm going to get you." He was also heard saying "I will be back; so you guys watch out."

Samantha, who remained at the gathering after Petitioner had been ejected from the gathering, had gotten a phone call from Anthony, who lived with Petitioner, saying Petitioner "came for his gun, and is on his way back."

Petitioner testified at his trial and admitted that, after he and his wife left the gathering, Petitioner and his wife returned together but he did not go inside. His story was that when he heard his wife scream from inside, Petitioner feared for her life and at that point decided to drive home and get his gun. Petitioner's plan was to get his wife and "get the hell out of there." He claims the victim grabbed the gun and caused it to discharge.

26

Others testified that when Petitioner arrived back at the gathering he was confronted by the victim at the front door. Defendant said "What are you looking for, bro? Are you looking for this?" and then Petitioner pulled out a gun. The victim tried to prevent Petitioner from entering the residence and during their scuffle the gun discharged. The victim immediately fell and it was later determined that he died from a bullet pierced his heart.

Petitioner testified that he was in shock after the shooting and, while he drove away from the gathering, he dismantled the gun and threw out the barrel, clip and "the pen that holds the gun together."

The jury apparently did not believe Petitioner's defense that he needed to kill because of an actual belief in the need to defend himself or his wife. The jury did not believe Petitioner lacked the malice of forethought as needed for a conviction for second degree murder.

Any evidence regarding the questioned overheard phone conversation of his wife after Petitioner was ejected from the gathering was simply superfluous evidence of malice. Petitioner's own words spoken to others was sufficient in and of itself.

(Doc. No. 18-22 at 5-6).

### 2.  Analysis

The Due Process Clause of the Fourteenth Amendment protects a criminal defendant from conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."  *In re Winship*, 397 U.S. 358, 364 (1970).  The federal standard for determining the sufficiency of the evidence to support a jury finding is set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).  Under *Jackson*, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* at 319 (emphasis in original); *see also Coleman v. Johnson*, 566 U.S. 650, 656 (2012) ("the only question under *Jackson* is whether that finding was so insupportable as to fall below the threshold of bare rationality"); *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (a reviewing court "may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury").

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."  *Jackson*, 443 U.S. at 324 n.16; *Juan H. v. Allen*,

1   408 F.3d 1262, 1275-76 (9th Cir. 2005).  The reviewing court should look to state law for the

2   elements of the offense and then turn to the federal question of whether any rational trier of fact

3   could have found the essential elements of the crime supported by sufficient evidence beyond a

4   reasonable doubt.  *See Johnson v. Montgomery*, 899 F.3d 1052, 1056 (9th Cir. 2018).

5         Further, when both *Jackson* and AEDPA apply to the same claim, the claim is reviewed

6   under a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012).  As noted by

7   the Supreme Court:

8           First, on direct appeal, "it is the responsibility of the jury−not the
    court−to decide what conclusions should be drawn from evidence
9           admitted at trial. A reviewing court may set aside the jury's verdict
    on the ground of insufficient evidence only if no rational trier of
10          fact could have agreed with the jury." And second, on habeas
    review, "a federal court may not overturn a state court decision
11          rejecting a sufficiency of the evidence challenge simply because the
    federal court disagrees with the state court. The federal court
12          instead may do so only if the state court decision was 'objectively
    unreasonable.'"
13

14  *Coleman*, 566 U.S. at 651.

15        Here, the jury rejected the first-degree murder charge and lesser-included offense of

16  involuntary manslaughter, finding Petitioner instead guilty of second-degree murder.  California

17  law defines second degree murder as the unlawful killing of a human being with malice

18  aforethought, but without additional elements that would support a conviction for first degree

19  murder.  *See People v. Chun*, 45 Cal. 4th 1172, 1181 (2009).  Malice may be express or implied.

20  *People v. Beltran*, 56 Cal. 4th 935, 941 (2013).  An unlawful killing committed without malice is

21  manslaughter, not murder.  Penal Code § 192 (defining voluntary manslaughter as the unlawful

22  killing of a human being without malice); *People v. Thomas*, 53 Cal.4th 771, 813 (2012)

23  (manslaughter is a lesser included offense of murder), *cert. denied*, 133 S.Ct. 380 (2012).

24        Self-defense can be "perfect" or "imperfect."  A killing in "perfect self-defense"

25  exonerates a defendant completely but the defendant "must actually *and* reasonably believe in the

26  necessity of defending [himself] from imminent danger of death or great bodily injury." *People*

27  *v. Randle,* 35 Cal.4th 987, 994 (2005) (italics in original), *overruled on other grounds by People*

28  *v. Sarun Chun,* 45 Cal.4th 1172 (2009).  "Imperfect self-defense" refers to an actual but

objectively unreasonable belief that deadly force is necessary to defend oneself or another person so that the defendant's actions are without malice but resulted in a conviction of voluntary manslaughter instead of murder. *Randle,* 35 Cal.4th at 994–95. "[T]he ultimate test of reasonableness is objective" and turns on "whether a reasonable person in defendant's position would have believed in the need to [to kill to prevent imminent harm] .... consider[ing] all of the relevant circumstances in which defendant found [himself]." *People v. Humphrey,* 13 Cal.4th 1073, 1087 (1996). Both perfect and imperfect self-defense require that the belief in the need to defend be precipitated by fear of imminent harm; "[f]ear of future harm – no matter how great the fear and no matter how great the likelihood of the harm – will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." *Id*. at 1082 (internal quotations and citations omitted).

Here, the Court of Appeal reasonably determined there was sufficient evidence to support a finding of malice within the meaning of California law. Petitioner does not explain how the state court decision was objectively unreasonable under controlling federal law. Even putting the statements that were attributed to his wife aside,[5] the record reveals sufficient evidence that Petitioner acted out of anger and not out of concern for his wife's imminent safety. Petitioner admitted he was fighting at the party and was clearly angry by being forcibly removed from the premises. There was testimony that Petitioner made express threats when he left as to what would happen when he returned. Petitioner admitted to driving 2 ½ miles to retrieve a gun after he heard his wife screaming instead of immediately entering the house to check on his wife or calling 911 to contact the police despite his cell phone being in his pocket. Anthony Martinez, who lived with Petitioner, called Samantha to warn them that Petitioner had retrieved a gun and was heading back. Petitioner immediately pulled out a gun when confronted at the door, which further reflects that he was angry and intended retribution for his earlier eviction. The jury was charged on first-degree murder, second-degree murder, and voluntary manslaughter. The jury had before it, and presumably considered, all the testimony as to Petitioner's state of mind, and

---

[5] Petitioner raised the hearsay objections on direct appeal. The appeals court found the statements did not constitute hearsay and found no trial court error by admitting the statements. (Doc. No. 18-18 at 13-15).

1    rejected Petitioner's claim that he was acting in defense of his wife when they chose not to

2    convict Petitioner of the lesser included offense of manslaughter and instead convict him of

3    second-degree murder.  (Doc. No. 18-2 at 12, 14).

4           Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact

5    could have found beyond a reasonable doubt that Petitioner harbored malice to be convicted of

6    second-degree murder as defined under California law.  As such, the state court's rejection of this

7    claim was not contrary to, or an unreasonable application of, clearly established Supreme Court

8    precedent, nor was it based on an unreasonable determination of the facts.  The undersigned

9    recommends that ground four be denied.

10          **V.  CERTIFICATE OF APPEALABIILTY**

11          A petitioner seeking a writ of habeas corpus has no absolute right to appeal a district

12   court's denial of a petition; he may appeal only in limited circumstances.  *See* 28 U.S.C. § 2253;

13   *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  Rule 11 Governing § 2254 Cases requires a

14   district court to issue or deny a certificate of appealability when entering a final order adverse to a

15   petitioner.  *See also* Ninth Circuit Rule 22-1(a); *United States v. Asrar*, 116 F.3d 1268, 1270 (9th

16   Cir. 1997).  A certificate of appealability will not issue unless a petitioner makes "a substantial

17   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This standard requires

18   the petitioner to show that "jurists of reason could disagree with the district court's resolution of

19   his constitutional claims or that jurists could conclude the issues presented are adequate to

20   deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327; *accord Slack v.*

21   *McDaniel*, 529 U.S. 473, 484 (2000).  Because the petitioner has not made a substantial showing

22   of the denial of a constitutional right, the undersigned recommends that the court decline to issue

23   a certificate of appealability.

24          Accordingly, it is **RECOMMENDED**:

25          1.  Petitioner's Petition for Wirt of Habeas Corpus (Doc. No. 1) be denied; and

26          2.  Petitioner be denied a certificate of appealability.

27          **NOTICE TO PARTIES**

28   These Findings and Recommendations will be submitted to the United States District

30

1    Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within 14 days

2    after being served with a copy of these Findings and Recommendations, a party may file written

3    objections with the Court.  *Id.*; Local Rule 304(b).  The document should be captioned,

4    "Objections to Magistrate Judge's Findings and Recommendations."  The assigned District Judge

5    will review these Findings and Recommendations under 28 U.S.C. § 636(b)(1)(C).  A party's

6    failure to file objections within the specified time may result in the waiver of certain rights on

7    appeal.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th Cir. 2014).

8

9    Dated:    October 4, 2024

10                                                                    HELENA M. BARCH-KUCHTA
                                                                      UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28